## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| LUIS SALAZAR, Individually and On Behalf of All Others Similarly Situated, | ) Case No. |
| | ) |
| | ) **COMPLAINT FOR VIOLATION OF** |
| Plaintiff, | ) **THE FEDERAL SECURITIES LAWS** |
| | ) |
| v. | ) **DEMAND FOR JURY TRIAL** |
| | ) |
| GENERAL ELECTRIC COMPANY, JOHN L. FLANNERY, JEFFREY R. IMMELT, JEFFREY S. BORNSTEIN, and KEITH S. SHERIN, | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

### CLASS ACTION COMPLAINT

Plaintiff Luis Salazar ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding General Electric Company ("GE"), analysts' reports and advisories about GE, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired GE securities between February 26, 2013 and January 12, 2018, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against GE and certain of its top officials.

2.      GE is a globally diversified technology and financial services company. GE offers a wide variety of products and services including aircraft engines, power generation, and water processing and household appliances.

3.      GE Capital is GE's financial services unit. It provides commercial lending and leasing, as well as a range of financial services for commercial aviation, energy, and support for GE's industrial business units.

4.      Founded in 1892, GE is headquartered in Boston, Massachusetts, and GE Capital's principal offices are located in Norwalk, Connecticut. GE's Securities trade on the New York Stock Exchange ("NYSE") under the ticker symbol "GE."

5.      Throughout the Class Period, Defendants made materially false and misleading statements regarding GE's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) GE was failing to allocate sufficient reserves with respect to premium deficiencies and other risks associated with GE Capital's legacy reinsurance business; (ii) these risks were then accruing billions of dollars in unreported impairment charges for GE; (iii) consequently, the value of GE was overstated during the Class Period, and additional undisclosed impairments were necessary; and (iv) as a result of the foregoing, GE's public statements were materially false and misleading

at all relevant times.  The misstatements and omissions in GE's Class Period Annual and Quarterly Reports violated, *inter alia*, Regulation S-K, Item 303, 17 C.F.R., § 229.303(a) and (b), and Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

6.      On July 21, 2017, GE's then-Chief Financial Officer ("CFO") Jeffrey S. Bornstein ("Bornstein") advised investors, in advance of GE's annual cash flow test of GE Capital's run-off insurance business, that "[w]e recently have had adverse claims experience in a portion of our long-term care portfolio and we will assess the adequacy of our premium returns."

7.      Following this news, GE's share price fell $0.78, or 2.92%, to close at $25.91 on July 21, 2017.

8.      Three months later, on October 20, 2017, Bornstein again addressed the adequacy of premium returns in GE Capital's insurance business, advising investors that GE "recently observed elevated claims experience for a portion of the long-term care book at GE Capital's legacy insurance business" and "began a comprehensive review in the third quarter of premium deficiency assumptions that are used in the annual claim reserve adequacy test."

9.      Following Bornstein's statements, GE's share price fell as much as $1.48, or 6.28%, to a low of $22.10 during intraday trading on October 20, 2017.  However, comments by GE Chief Executive Officer ("CEO") John Flannery ("Flannery") muted the effect of this partial revelation, as Flannery assured investors that he was concluding an "exhaustive" review of GE's business and that there were "no sacred cows" at GE.  On Flannery's comments, GE's share price rose $0.25, or 1.06%, to close at $23.83 on October 20, 2017.

10.     On January 16, 2018, GE announced that "the comprehensive review and reserve testing for GE Capital's run-off insurance portfolio, North American Life & Health (NALH), will result in an after-tax GAAP charge of $6.2 billion for the fourth quarter of 2017."  GE

further advised investors that "GE Capital expects to make statutory reserve contributions of ~$15 billion over seven years" and will suspend its dividend to GE for the "foreseeable future."

11.     That same day, on a conference call with investors and analysts, CEO Flannery stated, in part, that "[c]learly, in hindsight, we underappreciated the risk in [GE's insurance business] book" and that GE was "looking aggressively at the best structure or structures for our portfolio to maximize the potential of our businesses," which "could result in many, many different permutations, including separately traded assets really in any one of our units, if that's what made sense."

12.     On this news, GE's share price fell $1.43, or 7.62%, over the following two trading sessions, to close at $17.33 on January 17, 2018.

13.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of GE's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

16.     Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b).   GE Capital maintains its principal executive offices in this Judicial District. Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.   Many of the acts charged herein, including the dissemination

of materially false and/or misleading information, occurred in substantial part in this Judicial District.

17.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

18.     Plaintiff, as set forth in the attached Certification, acquired GE Securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

19.     Defendant GE is incorporated in New York, with principal executive offices located at 41 Farnsworth Street, Boston, Massachusetts 02210. GE Capital is headquartered in Connecticut. GE's securities trade on the NYSE under the ticker symbol "GE."

20.     Defendant Flannery has served as GE's CEO since August 2017.

21.     Defendant Jeffrey R. Immelt ("Immelt") served as GE's CEO from September 2001 until August 2017.

22.     Defendant Bornstein served as GE's CFO from July 2013 until November 2017.

23.     Defendant Keith S. Sherin ("Sherin") served as GE's CFO from December 1998 until July 2013, and served as GE Capital's CEO from July 2013 until September 2016.

24.     The Defendants referenced above in ¶¶ 20-23 are sometimes referred to collectively herein as the "Individual Defendants."

25.     The Individual Defendants because of their positions with GE, possessed the power and authority to control the contents of GE's reports to the SEC, press releases and

presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of GE's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

26.     GE is a globally diversified technology and financial services company. GE offers a wide variety of products and services including aircraft engines, power generation, and water processing and household appliances.

27.     GE Capital is GE's financial services unit. It provides commercial lending and leasing, as well as a range of financial services for commercial aviation, energy, and support for GE's industrial business units.

### Materially False and Misleading Statements Issued During the Class Period

28.     The Class Period begins on February 26, 2013, when GE filed an Annual Report on Form 10-K with the SEC, announcing GE's financial and operating results for the quarter and fiscal year ended December 31, 2012 (the "2012 10-K").  For the quarter, GE reported net income of $4.01 billion, or $0.38 per diluted share, on revenue of $38.33 billion, compared to net income of $3.73 billion, or $0.35 per diluted share, on revenue of $37.71 billion for the same

period in the prior year.  For 2012, GE reported net income of $13.64 billion, or $1.29 per diluted share, on revenue of $144.12 billion, compared to net income of $14.15 billion, or $1.23 per diluted share, on revenue of $142.22 billion for 2011.  For 2012, GE Capital reported segment profit of $7.40 billion, on revenue of $46.04 billion.

29.     In the 2012 10-K, in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") section, GE stated in relevant part:

> GE Capital (33% and 28% of consolidated three-year revenues and total segment profit, respectively) net earnings increased 12% in 2012 and 111% in 2011 due to the continued stabilization in the overall economic environment. Increased stability in the financial markets has contributed to lower losses and a significant increase in segment profit to $7.4 billion in 2012 and $6.6 billion in 2011. We also reduced our ending net investment (ENI), excluding cash and equivalents, from $513 billion at January 1, 2009 to $419 billion at December 31, 2012. GECC is a diversely funded and smaller, more focused finance company with strong positions in several commercial mid-market and consumer financing segments.

30.     The 2012 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Immelt and Sherin, stating that the financial information contained in the 2012 10-K was accurate and disclosed any material changes to GE's internal control over financial reporting.

31.     On May 8, 2013, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended March 31, 2013 (the "1Q13 10-Q").  For the quarter, GE reported net income of $3.52 billion, or $0.34 per diluted share, on revenue of $33.28 billion, compared to net income of $3.03 billion, or $0.29 per diluted share, on revenue of $34.52 billion for the same period in the prior year.

32.     In the 1Q13 10-Q's MD&A section, GE stated, in relevant part:

> GE Capital revenues increased 2% and net earnings increased 9% in the first quarter of 2013. Revenues increased as a result of higher gains, partially offset by organic revenue declines, primarily due to lower ENI, and higher impairments. Net earnings increased as a result of higher gains and core increases, partially

offset by higher provisions for losses on financing receivables and higher impairments.

33.     The 1Q13 10-Q contained signed certifications pursuant to SOX by Defendants Immelt and Sherin, stating that the financial information contained in the 1Q13 10-Q was accurate and disclosed any material changes to GE's internal control over financial reporting.

34.     On July 26, 2013, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended June 30, 2013 (the "2Q13 10-Q").  For the quarter, GE reported net income of $3.13 billion, or $0.30 per diluted share, on revenue of $34.95 billion, compared to net income of $3.10 billion, or $0.29 per diluted share, on revenue of $36 billion for the same period in the prior year.

35.     In the 2Q13 10-Q's MD&A section, GE stated, in relevant part:

GE Capital revenues decreased 3% and net earnings decreased 9% in the three months ended June 30, 2013. Revenues decreased as a result of organic revenue declines, primarily due to lower ENI, and higher impairments, partially offset by higher gains. Net earnings decreased as a result of higher impairments, higher provisions for losses on financing receivables and core decreases, partially offset by higher gains and dispositions.

GE Capital revenues decreased 1% and net earnings decreased 1% in the six months ended June 30, 2013. Revenues for the six months ended June 30, 2013 included $0.1 billion from acquisitions. Revenues decreased as a result of organic revenue declines, primarily due to lower ENI, and higher impairments, partially offset by higher gains. Net earnings decreased as a result of higher provisions for losses on financing receivables and higher impairments, partially offset by higher gains and dispositions.

36.     The 2Q13 10-Q contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained in the 2Q13 10-Q was accurate and disclosed any material changes to GE's internal control over financial reporting.

37.     On November 1, 2013, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended September 30, 2013 (the

"3Q13 10-Q").  For the quarter, GE reported net income of $3.19 billion, or $0.31 per diluted

share, on revenue of $35.29 billion, compared to net income of $3.49 billion, or $0.33 per diluted

share, on revenue of $35.46 billion for the same period in the prior year.

38.     In the 3Q13 10-Q's MD&A section, GE stated, in relevant part:

> GE Capital revenues decreased 5% and net earnings increased 13% in the three
> months ended September 30, 2013. Revenues for the three months ended
> September 30, 2013 declined by $0.2 billion as a result of the effects of
> dispositions. Additionally, revenues decreased as a result of organic revenue
> declines, primarily due to lower ENI and lower gains, partially offset by lower
> impairments. Net earnings increased as a result of lower provisions for losses on
> financing receivables and core increases, partially offset by lower gains and
> dispositions.
>
> GE Capital revenues decreased 2% and net earnings increased 3% in the nine
> months ended September 30, 2013. Revenues for the nine months ended
> September 30, 2013 included $0.1 billion from acquisitions and declined by $0.2
> billion as a result of the effects of dispositions. Additionally, revenues decreased
> as a result of organic revenue declines, primarily due to lower ENI, partially
> offset by higher gains. Net earnings increased as a result of higher gains, core
> increases and dispositions, partially offset by higher impairments and higher
> provisions for losses on financing receivables.

39.     The 3Q13 10-Q contained signed certifications pursuant to SOX by Defendants

Immelt and Bornstein, stating that the financial information contained in the 3Q13 10-Q was

accurate and disclosed any material changes to GE's internal control over financial reporting.

40.     On February 27, 2014, GE filed an Annual Report on Form 10-K with the SEC,

announcing GE's financial and operating results for the quarter and fiscal year ended December

31, 2013 (the "2013 10-K").  For the quarter, GE reported net income of $3.2 billion, or $0.32

per diluted share, on revenue of $39.45 billion, compared to net income of $4.01 billion, or $0.38

per diluted share, on revenue of $38.33 billion for the same period in the prior year.  For 2013,

GE reported net income of $13.05 billion, or $1.27 per diluted share, on revenue of $142.93

billion, compared to net income of $13.64 billion, or $1.29 per diluted share, on revenue of

$144.12 billion for 2012.  For 2013, GE Capital reported segment profit of $8.25 billion, on revenue of $44.06 billion.

41.     In the 2013 10-K, in the MD&A section, GE stated, in relevant part:

GE Capital (31% and 33% of consolidated three-year revenues and total segment profit, respectively) revenues decreased 3% in 2013 and 6% in 2012, reflecting a reduction in ending net investment (ENI). Net earnings increased 12% in 2013 and 13% in 2012 as a result of dispositions and higher gains, partially offset by higher impairments and higher provisions for losses on financing receivables. We reduced ENI, excluding cash and equivalents, to $380 billion at December 31, 2013. GECC is a diversely funded and smaller, more focused finance company with strong positions in several commercial mid-market and consumer financing segments.

42.     The 2013 10-K contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to GE's internal control over financial reporting.

43.     On May 12, 2014, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended March 31, 2014 (the "1Q14 10-Q").  For the quarter, GE reported net income of $2.99 billion, or $0.30 per diluted share, on revenue of $33.35 billion, compared to net income of $3.52 billion, or $0.34 per diluted share, on revenue of $33.28 billion for the same period in the prior year.

44.     In the 1Q14 10-Q's MD&A section, GE stated, in relevant part:

**GE Capital**

GE Capital revenues decreased 8% and net earnings were flat in the three months ended March 31, 2014. Revenues decreased as a result of lower gains, the effects of dispositions and organic revenue declines, primarily due to lower ENI, partially offset by lower impairments. Net earnings reflected lower gains, core decreases and dispositions offset by lower provisions for losses on financing receivables and lower impairments.

We have communicated our goal of reducing GE Capital's ending net investment (ENI), most recently targeting ENI of $300 billion to $350 billion. ENI is a metric used by us to measure the total capital we have invested in our financial

services business. GE Capital's ENI (excluding cash and equivalents) was $374 billion at March 31, 2014. To achieve this goal, we are more aggressively focusing our businesses on selective financial services products where we have deep domain experience, broad distribution, the ability to earn a consistent return on capital and are competitively advantaged, while managing our overall balance sheet size and risk. We have a strategy of exiting those businesses that are deemed to be non-strategic or that are underperforming. We have completed a number of dispositions in our businesses in the past and will continue to evaluate options going forward.

Accordingly, in the short-term, as we reduce our ENI through exiting non-core businesses, the overall level of our future net earnings may be reduced. However, over the long-term, we believe that this strategy will improve our long-term performance through higher returns as we will have a larger concentration of assets in our core businesses, as opposed to the underperforming or non-strategic assets we will be exiting; reduce liquidity risk as we pay down outstanding debt and diversify our sources of funding (with less reliance on the global commercial paper markets and an increase in alternative sources of funding such as deposits); and reduce capital requirements while strengthening capital ratios.

45.     The 1Q14 10-Q contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained in the 1Q14 10-Q was accurate and disclosed any material changes to GE's internal control over financial reporting.

46.     On July 31, 2014, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended June 30, 2014 (the "2Q14 10-Q").  For the quarter, GE reported net income of $3.54 billion, or $0.35 per diluted share, on revenue of $31.92 billion, compared to net income of $3.13 billion, or $0.30 per diluted share, on revenue of $34.95 billion for the same period in the prior year.

47.     In the 2Q14 10-Q's MD&A section, GE stated, in relevant part:

**GE Capital**

GE Capital revenues decreased 6% and net earnings decreased 5% in the three months ended June 30, 2014. Revenues decreased as a result of organic revenue declines, lower gains and the effects of dispositions, partially offset by lower impairments. Net earnings reflected the effects of dispositions and lower gains, partially offset by lower impairments, core increases and lower provisions for losses on financing receivables.

GE Capital revenues decreased 7% and net earnings decreased 2% in the six months ended June 30, 2014. Revenues decreased as a result of lower gains, organic revenue declines, primarily due to lower ENI, and the effects of dispositions, partially offset by lower impairments. Net earnings reflected lower gains, the effects of dispositions and core decreases, partially offset by lower impairments and lower provisions for losses on financing receivables.

We have communicated our goal of reducing GE Capital's ENI, excluding cash and equivalents, most recently targeting a balance of $300 billion to $350 billion. ENI is a metric used by us to measure the total capital we have invested in our financial services business. GE Capital's ENI, excluding cash and equivalents, was $371 billion at June 30, 2014. To achieve this goal, we are more aggressively focusing our businesses on selective financial services products where we have deep domain experience, broad distribution, the ability to earn a consistent return on capital and are competitively advantaged, while managing our overall balance sheet size and risk. We have a strategy of exiting those businesses that are deemed to be non-strategic or that are underperforming. We have completed a number of dispositions in our businesses in the past and will continue to evaluate options going forward.

Accordingly, in the short-term, as we reduce our ENI through exiting non-core businesses, the overall level of our future net earnings may be reduced. However, over the long-term, we believe that this strategy will improve our long-term performance through higher returns as we will have a larger concentration of assets in our core businesses, as opposed to the underperforming or non-strategic assets we will be exiting; reduce liquidity risk as we pay down outstanding debt and diversify our sources of funding (with less reliance on the global commercial paper markets and an increase in alternative sources of funding such as deposits); and reduce capital requirements while strengthening capital ratios.

48. The 2Q14 10-Q contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained in the 2Q14 10-Q was accurate and disclosed any material changes to GE's internal control over financial reporting.

49. On November 4, 2014, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended September 30, 2014 (the "3Q14 10-Q").  For the quarter, GE reported net income of $3.53 billion, or $0.35 per diluted share, on revenue of $31.84 billion, compared to net income of $3.19 billion, or $0.31 per diluted share, on revenue of $35.29 billion for the same period in the prior year.

50.     In the 3Q14 10-Q's MD&A section, GE stated, in relevant part:

**GE Capital**

GE Capital revenues decreased 1% and net earnings decreased 22% in the three months ended September 30, 2014. Revenues decreased as a result of organic revenue declines, and the effects of dispositions, partially offset by higher gains and lower impairments. Net earnings reflected core decreases, higher provisions for losses on financing receivables and the effects of dispositions, partially offset by higher gains and lower impairments.

GE Capital revenues decreased 5% and net earnings decreased 9% in the nine months ended September 30, 2014. Revenues decreased as a result of organic revenue declines, primarily due to lower ENI, the effects of dispositions and lower gains, partially offset by lower impairments. Net earnings reflected core decreases, the effects of dispositions and lower gains, partially offset by lower impairments and lower provisions for losses on financing receivables.

We have communicated our goal of reducing GE Capital's ENI, excluding cash and equivalents, most recently targeting a balance of $300 billion to $350 billion. ENI is a metric used by us to measure the total capital we have invested in our financial services business. GE Capital's ENI, excluding cash and equivalents, was $365 billion at September 30, 2014. To achieve this goal, we are more aggressively focusing our businesses on selective financial services products where we have deep domain experience, broad distribution, the ability to earn a consistent return on capital and are competitively advantaged, while managing our overall balance sheet size and risk. We have a strategy of exiting those businesses that are deemed to be non-strategic or that are underperforming. We have completed a number of dispositions in our businesses in the past and will continue to evaluate options going forward.

Accordingly, in the short-term, as we reduce our ENI through exiting non-core businesses, the overall level of our future net earnings may be reduced. However, over the long-term, we believe that this strategy will improve our long-term performance through higher returns as we will have a larger concentration of assets in our core businesses, as opposed to the underperforming or non-strategic assets we will be exiting; reduce liquidity risk as we pay down outstanding debt and diversify our sources of funding (with less reliance on the global commercial paper markets and an increase in alternative sources of funding such as deposits); and reduce capital requirements while strengthening capital ratios.

51.     The 3Q14 10-Q contained signed certifications pursuant to SOX by Defendants

Immelt and Bornstein, stating that the financial information contained in the 3Q14 10-Q was

accurate and disclosed any material changes to GE's internal control over financial reporting.

52.     On February 27, 2015, GE filed an Annual Report on Form 10-K with the SEC, announcing GE's financial and operating results for the quarter and fiscal year ended December 31, 2014 (the "2014 10-K").  For the quarter, GE reported net income of $5.15 billion, or $0.51 per diluted share, on revenue of $33.42 billion, compared to net income of $3.26 billion, or $0.32 per diluted share, on revenue of $39.45 billion, for the same period in the prior year.  For 2014, GE reported net income of $15.23 billion, or $1.50 per diluted share, on revenue of $116.40 billion, compared to net income of $13.05 billion, or $1.27 per diluted share, on revenue of $142.93 billion for 2013.  For 2014, GE Capital reported segment profit of $7.01 billion, on revenue of $42.72 billion.

53.     In the 2014 10-K, in the MD&A section, GE stated, in relevant part:

We have communicated our goal of reducing GE Capital's ENI, excluding liquidity, most recently targeting a balance of less than $300 billion. ENI is a metric used by us to measure the total capital we have invested in our financial services business. GE Capital's ENI (excluding liquidity) was $363 billion at December 31, 2014. To achieve this goal, we are more aggressively focusing our businesses on selective financial services products where we have deep domain experience, broad distribution, the ability to earn a consistent return on capital and are competitively advantaged, while managing our overall balance sheet size and risk. We have a strategy of exiting those businesses that are deemed to be non-strategic or that are underperforming. We have completed a number of dispositions in our businesses in the past and will continue to evaluate options going forward.

Accordingly, in the short-term, as we reduce our ENI through exiting non-core businesses, the overall level of our net earnings may be reduced, which potentially could include impairments, restructurings and other non-cash charges. However, over the long-term, we believe that this strategy will improve our long-term performance through higher returns as we will have a larger concentration of assets in our core businesses, as opposed to the underperforming or non-strategic assets we will be exiting; reduce liquidity risk as we pay down outstanding debt and diversify our sources of funding (with less reliance on the global commercial paper markets and an increase in alternative sources of funding such as deposits); and reduce capital requirements while strengthening capital ratios.

54.     The 2014 10-K contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to GE's internal control over financial reporting.

55.     On May 4, 2015, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended March 31, 2015 (the "1Q15 10-Q").  For the quarter, GE reported a net loss of $13.57 billion, or $1.35 per diluted share, on revenue of $26.09 billion, compared to net income of $2.99 billion, or $0.30 per diluted share, on revenue of $33.35 billion for the same period in the prior year.

56.     In the 1Q15 10-Q's MD&A section, GE stated, in relevant part:

**THE GE CAPITAL EXIT PLAN**

On April 10, 2015, the Company announced a plan (the GE Capital Exit Plan) to reduce the size of its financial services businesses through the sale of most of the assets of GECC over the next 24 months, and to focus on continued investment and growth in the Company's industrial businesses. Under the GE Capital Exit Plan, which was approved on April 2, 2015 and aspects of which were approved on March 31, 2015, the Company will retain certain GECC businesses, principally its vertical financing businesses—GE Capital Aviation Services (GECAS), Energy Financial Services and Healthcare Equipment Finance—that directly relate to the Company's core industrial domain and other operations, including Working Capital Solutions and our run-off insurance activities. The assets planned for disposition include Real Estate, most of Commercial Lending and Leasing and all Consumer platforms (including all U.S. banking assets). The Company expects to execute this strategy using an efficient approach for exiting non-vertical assets that works for the Company's and GECC's debt holders and the Company's shareowners. An element of this approach involves a merger of GECC into the Company to assure compliance with debt covenants as GECC exits non-vertical assets, and the creation of a new intermediate holding company to hold GECC's businesses after the merger. The Company has discussed the GE Capital Exit Plan, aspects of which are subject to regulatory review and approval, with its regulators and staff of the Financial Stability Oversight Council (FSOC) and will work closely with these bodies to take the actions necessary over time to terminate the FSOC's designation of GECC (and the new intermediate holding company, as applicable) as a nonbank systemically important financial institution (nonbank SIFI).

57.     The 1Q15 10-Q contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained in the 1Q15 10-Q was accurate and disclosed any material changes to GE's internal control over financial reporting.

58.     On July 30, 2015, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended June 30, 2015 (the "2Q15 10-Q").  For the quarter, GE reported a net loss of $1.36 billion, or $0.13 per diluted share, on revenue of $28.44 billion, compared to net income of $3.54 billion, or $0.35 per diluted share, on revenue of $31.92 billion for the same period in the prior year.

59.     In the 2Q215 10-Q's MD&A section, GE stated, in relevant part:

**THE GE CAPITAL EXIT PLAN**

On April 10, 2015, the Company announced its plan (the GE Capital Exit Plan) to reduce the size of its financial services businesses through the sale of most of the assets of GECC over the following 24 months and to focus on continued investment and growth in the Company's industrial businesses. Under the GE Capital Exit Plan, which was approved on April 2, 2015 and aspects of which were approved on March 31, 2015, the Company will retain certain GECC businesses, principally its vertical financing businesses—GE Capital Aviation Services (GECAS), Energy Financial Services and Healthcare Equipment Finance—that directly relate to the Company's core industrial domain and other operations, including Working Capital Solutions and our run-off insurance activities (together referred to as GE Capital Verticals or Verticals). The assets planned for disposition include Real Estate, most of Commercial Lending and Leasing (CLL) and all Consumer platforms (including all U.S. banking assets). The Company expects to execute this strategy using an efficient approach for exiting non-vertical assets that works for the Company's and GECC's debt holders and the Company's shareowners. An element of this approach involves a merger of GECC into the Company to assure compliance with debt covenants as GECC exits non-vertical assets, and the creation of a new intermediate holding company to hold GECC's businesses after the merger. The Company has discussed the GE Capital Exit Plan, aspects of which are subject to regulatory review and approval, with its regulators and staff of the Financial Stability Oversight Council (FSOC) and will work closely with these bodies to take the actions necessary over time to terminate the FSOC's designation of GECC (and the new intermediate holding company, as applicable) as a nonbank systemically important financial institution (nonbank SIFI).

60.    The 2Q15 10-Q contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained in the 2Q15 10-Q was accurate and disclosed any material changes to GE's internal control over financial reporting.

61.    On November 2, 2015, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended September 30, 2015 (the "3Q15 10-Q").   For the quarter, GE reported net income of $2.50 billion, or $0.25 per diluted share, on revenue of $27.85 billion, compared to net income of $3.53 billion, or $0.35 per diluted share, on revenue of $31.84 billion for the same period in the prior year.

62.    In the 3Q15 10-Q's MD&A section, GE stated, in relevant part:

**THE GE CAPITAL EXIT PLAN**

On April 10, 2015, the Company announced its plan (the GE Capital Exit Plan) to reduce the size of its financial services businesses through the sale of most of the assets of GECC over the following 24 months, and to focus on continued investment and growth in the Company's industrial businesses. Under the GE Capital Exit Plan, which was approved on April 2, 2015 and aspects of which were approved on March 31, 2015, the Company will retain certain GECC businesses, principally its vertical financing businesses—GE Capital Aviation Services, Energy Financial Services and Healthcare Equipment Finance—that directly relate to the Company's core industrial domain and other operations, including Working Capital Solutions and our run-off insurance activities (together referred to as GE Capital Verticals or Verticals). The assets planned for disposition include Real Estate, most of Commercial Lending and Leasing (CLL) and all Consumer platforms (including all U.S. banking assets). The Company expects to execute this strategy using an efficient approach for exiting non-vertical assets that works for the Company's and GECC's debt holders and the Company's shareowners. An element of this approach involves a merger of GECC into the Company to assure compliance with debt covenants as GECC exits non-vertical assets, and the creation of a new intermediate holding company to hold GECC's businesses after the merger. The Company has discussed the GE Capital Exit Plan, aspects of which are subject to regulatory review and approval, with its regulators and staff of the Financial Stability Oversight Council (FSOC) and will work closely with these bodies to take the actions necessary over time to terminate the FSOC's designation of GECC (and the new intermediate holding company, as applicable) as a nonbank systemically important financial institution (nonbank SIFI).

63.     The 3Q15 10-Q contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained in the 3Q15 10-Q was accurate and disclosed any material changes to GE's internal control over financial reporting.

64.     On February 26, 2016, GE filed an Annual Report on Form 10-K with the SEC, announcing GE's financial and operating results for the quarter and fiscal year ended December 31, 2015 (the "2015 10-K").  For the quarter, GE reported net income of $6.3 billion, or $0.64 per diluted share, on revenue of $32.75 billion, compared to net income of $5.15 billion, or $0.51 per diluted share, on revenue of $33.42 billion for the same period in the prior year.  For 2015, GE reported a net loss of $6.12 billion, or $0.62 per diluted share, on revenue of $115.15 billion, compared to net income of $15.23 billion, or $1.50 per diluted share, on revenue of $116.40 billion for 2014.  For 2015, GE Capital reported a segment loss of $7.98 billion, on revenue of $10.8 billion.

65.     In the 2015 10-K, in the MD&A section, GE stated, in relevant part:

**THE GE CAPITAL EXIT PLAN**

On April 10, 2015, the Company announced a plan (the GE Capital Exit Plan) to create a simple, more valuable company by reducing the size of its financial services businesses through the sale of most of the assets of GE Capital and aligning a smaller GE Capital with GE's industrial growth. We expect GE Capital to release approximately $35 billion in dividends to GE (subject to regulatory approval) as a result of the sale of GE Capital assets. As of December 31, 2015, we are ahead of our plan, having signed agreements with buyers for $157 billion of ending net investment (ENI), excluding liquidity of which $104 billion has closed. In addition, as part of our initiative to reduce the size of our financial services businesses, we completed the split-off of our remaining interest in GE Capital's North American Retail Finance business, Synchrony Financial, to holders of GE common stock, which resulted in a $20.4 billion buyback of GE common stock (671.4 million shares) in 2015. Combined with cash dividends of $4.3 billion, GE Capital returned about $25 billion to GE in 2015. In connection with the GE Capital Exit Plan, we completed a legal reorganization of GE Capital that included a merger of GE Capital into GE, a guarantee by GE of GE Capital debt, and an exchange of $36 billion of GE Capital debt for new GE notes. The result of all these actions reduced GE Capital's total assets by 38% from $501

billion at December 31, 2014 to $312 billion at December 31, 2015. We incurred charges of $22 billion related to these actions.

Given the progress of the GE Capital Exit Plan to date, we expect to largely complete that plan by the end of 2016 and are on track to file for rescission of GE Capital's designation as a nonbank Systemically Important Financial Institution (nonbank SIFI) in early 2016.

66.     The 2015 10-K contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to GE's internal control over financial reporting.

67.     On May 4, 2016, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended March 31, 2016 (the "1Q16 10-Q").  For the quarter, GE reported net income of $228 million, or $0.01 per diluted share, on revenue of $27.83 billion, compared to a net loss of $13.57 billion, or $1.35 per diluted share, on revenue of $26.09 billion for the same period in the prior year.

68.     In the 1Q16 10-Q's MD&A section, GE stated, in relevant part:

**THE GE CAPITAL EXIT PLAN**

On April 10, 2015, the Company announced a plan (the GE Capital Exit Plan) to create a simple, more valuable company by reducing the size of its financial services businesses through the sale of most of the assets of GE Capital and aligning a smaller GE Capital with GE's industrial businesses. We expect GE Capital to release approximately $35 billion in dividends to GE (subject to regulatory approval) as a result of the sale of GE Capital assets. We received $4.3 billion in dividends from GE Capital in 2015 and $7.5 billion in the first quarter of 2016. As of March 31, 2016, we are ahead of our plan, having signed agreements with buyers for $166 billion of ending net investment (ENI), excluding liquidity (as originally reported at December 31, 2014), of which $146 billion has closed. In addition, as part of our initiative to reduce the size of our financial services businesses, we completed the split-off of our remaining interest in GE Capital's North American Retail Finance business, Synchrony Financial, to holders of GE common stock, which resulted in a $20.4 billion buyback of GE common stock (671.4 million shares) in 2015. In connection with the GE Capital Exit Plan, we completed a legal reorganization of GE Capital that included a merger of GE Capital into GE, a guarantee by GE of GE Capital debt, and an exchange of $36 billion of GE Capital debt for new GE notes. The result of all

these actions reduced GE Capital's total assets by 44% from $501 billion at December 31, 2014 to $281 billion at March 31, 2016. As of March 31, 2016, we incurred charges of $22.6 billion related to these actions and remain on track versus our $23 billion estimate.

Given the progress of the GE Capital Exit Plan to date, we expect to largely complete that plan by the end of 2016. On March 31, 2016, GE filed its request to the Financial Stability Oversight Council (FSOC) for rescission of GE Capital's designation as a nonbank Systemically Important Financial Institution (SIFI).

69.     The 1Q16 10-Q contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained in the 1Q16 10-Q was accurate and disclosed any material changes to GE's internal control over financial reporting.

70.     On August 1, 2016, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended June 30, 2016 (the "2Q16 10-Q").  For the quarter, GE reported net income of $2.9 billion, or $0.30 per diluted share, on revenue of $30.34 billion, compared to a net loss of $1.36 billion, or $0.13 per diluted share, on revenue of $28.44 billion for the same period in the prior year.

71.     In the 2Q16 10-Q's MD&A section, GE stated, in relevant part:

**THE GE CAPITAL EXIT PLAN**

On April 10, 2015, the Company announced a plan (the GE Capital Exit Plan) to create a simple, more valuable company by reducing the size of its financial services businesses through the sale of most of the assets of GE Capital over the following 24 months and aligning a smaller GE Capital with GE's industrial businesses.

Under the GE Capital Exit Plan, which was approved on April 2, 2015 and aspects of which were approved on March 31, 2015, the Company will retain certain GE Capital businesses, principally its vertical financing businesses—GE Capital Aviation Services (GECAS), Energy Financial Services (EFS) and Industrial Finance (which includes Healthcare Equipment Finance, Working Capital Solutions and Industrial Financing Solutions)—that relate to the Company's core industrial domain and other operations, including our run-off insurance activities, and allocated corporate costs (together referred to as GE Capital Verticals or Verticals).

We expect GE Capital to release approximately $35 billion in dividends to GE (subject to regulatory approval) as a result of the sale of GE Capital assets. We received $4.3 billion in dividends from GE Capital in 2015 and $11 billion in the first half of 2016. In July 2016, we received an additional $4 billion of common dividends from GE Capital bringing our year-to-date total to $15 billion. As of June 30, 2016, we are ahead of our plan, having signed agreements with buyers for $181 billion of ending net investment (ENI), excluding liquidity (as originally reported at December 31, 2014), of which $158 billion has closed. In addition, as part of our initiative to reduce the size of our financial services businesses, we completed the split-off of our remaining interest in GE Capital's North American Retail Finance business, Synchrony Financial, to holders of GE common stock, which resulted in a $20.4 billion buyback of GE common stock (671.4 million shares) in 2015. In connection with the GE Capital Exit Plan, we completed a legal reorganization of GE Capital that included a merger of GE Capital into GE, a guarantee by GE of GE Capital debt, and an exchange of $36 billion of GE Capital debt for new notes guaranteed by GE. The result of all these actions reduced GE Capital's total assets by 56% from $501 billion at December 31, 2014 to $219 billion at June 30, 2016. As of June 30, 2016, we incurred charges of $23.2 billion. Due to anticipated tax benefits and gains, we do not expect total after-tax charges through the completion of the GE Capital Exit Plan to exceed our initial $23 billion estimate.

Given the progress of the GE Capital Exit Plan to date, we expect to largely complete that plan by the end of 2016. On March 31, 2016, GE filed its request to the Financial Stability Oversight Council (FSOC) for rescission of GE Capital's designation as a nonbank Systemically Important Financial Institution (SIFI). On June 28, 2016, we received approval of our request to the FSOC for rescission of GE Capital's designation as a nonbank SIFI.

72.     The 2Q16 10-Q contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained in the 2Q16 10-Q was accurate and disclosed any material changes to GE's internal control over financial reporting.

73.     On November 2, 2016, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended September 30, 2016 (the "3Q16 10-Q"). For the quarter, GE reported net income of $2.02 billion, or $0.22 per diluted share, on revenue of $29.03 billion, compared to net income of $2.50 billion, or $0.25 per diluted share, on revenue of $27.85 billion for the same period in the prior year.

74.     In the 3Q16 10-Q's MD&A section, GE stated, in relevant part:

**THE GE CAPITAL EXIT PLAN**

On April 10, 2015, the Company announced a plan (the GE Capital Exit Plan) to create a simple, more valuable company by reducing the size of its financial services businesses through the sale of most of the assets of GE Capital over the following 24 months and aligning a smaller GE Capital with GE's industrial businesses.

Under the GE Capital Exit Plan, which was approved on April 2, 2015 and aspects of which were approved on March 31, 2015, the Company is retaining certain GE Capital businesses, principally its vertical financing businesses—GE Capital Aviation Services (GECAS), Energy Financial Services (EFS) and Industrial Finance (which includes Healthcare Equipment Finance, Working Capital Solutions and Industrial Financing Solutions)—that relate to the Company's core industrial domain and other operations, including our run-off insurance activities, and allocated corporate costs (together referred to as GE Capital Verticals or Verticals).

We expect GE Capital to release approximately $35 billion in dividends to GE (subject to regulatory approval) as a result of the sale of GE Capital assets. We received $4.3 billion in dividends from GE Capital in 2015 and $16.1 billion in the first nine months of 2016. In October 2016, we received and additional $2.0 billion of common dividends from GE Capital bringing our year-to-date total to $18.1 billion. As of September 30, 2016, we are ahead of our plan, having signed agreements with buyers for $193 billion of ending net investment (ENI), excluding liquidity (as originally reported at December 31, 2014), of which $173 billion has closed. In addition, as part of our initiative to reduce the size of our financial services businesses, we completed the split-off of our remaining interest in GE Capital's North American Retail Finance business, Synchrony Financial, to holders of GE common stock, which resulted in a $20.4 billion buyback of GE common stock (671.4 million shares) in 2015. In connection with the GE Capital Exit Plan, we completed a legal reorganization of GE Capital that included a merger of GE Capital into GE, a guarantee by GE of GE Capital debt, and an exchange of $36 billion of GE Capital debt for new notes guaranteed by GE. The result of all these actions reduced GE Capital's total assets by 59% from $501 billion at December 31, 2014 to $203 billion at September 30, 2016. As of September 30, 2016, we incurred charges of $22.9 billion.  Due to anticipated tax benefits and gains, we do not expect total after-tax charges through the completion of the GE Capital Exit Plan to exceed our initial $23 billion estimate.

Given the progress of the GE Capital Exit Plan to date, we expect to largely complete that plan by the end of 2016. On March 31, 2016, GE filed its request to the Financial Stability Oversight Council (FSOC) for rescission of GE Capital's designation as a nonbank Systemically Important Financial Institution (SIFI). On June 28, 2016, we received approval of our request to the FSOC for rescission of GE Capital's designation as a nonbank SIFI.

75.    The 3Q16 10-Q contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained in the 3Q16 10-Q was accurate and disclosed any material changes to GE's internal control over financial reporting.

76.    On February 24, 2017, GE filed an Annual Report on Form 10-K with the SEC, announcing GE's financial and operating results for the quarter and fiscal year ended December 31, 2016 (the "2016 10-K").  For the quarter, GE reported net income of $3.66 billion, or $0.39 per diluted share, on revenue of $32.46 billion, compared to net income of $6.30 billion, or $0.64 per diluted share, on revenue of $32.75 billion for the same period in the prior year.  For 2016, GE reported net income of $8.83 billion, or $0.89 per diluted share, on revenue of $119.68 billion, compared to a net loss of $6.12 billion, or $0.62 per diluted share, on revenue of $115.15 billion for 2015.  For 2016, GE Capital reported a segment loss of $1.25 billion, on revenue of $10.90 billion.

77.    In the 2016 10-K, in the MD&A section, GE stated, in relevant part:

**THE GE CAPITAL EXIT PLAN**

On April 10, 2015, the Company announced a plan (the GE Capital Exit Plan) to create a simple, more valuable company by reducing the size of its financial services businesses through the sale of most of the assets of GE Capital over the following 24 months and aligning a smaller GE Capital with GE's industrial businesses.

Under the GE Capital Exit Plan, the Company is retaining certain GE Capital businesses, principally its vertical financing businesses—GE Capital Aviation Services (GECAS), Energy Financial Services (EFS) and Industrial Finance (which includes Healthcare Equipment Finance, Working Capital Solutions and Industrial Financing Solutions)—that relate to the Company's core industrial domain and other operations, including our run-off insurance activities, and allocated corporate costs (together referred to as GE Capital Verticals or Verticals).

As a result of the GE Capital Exit Plan dispositions, GE Capital has paid $24.4 billion in dividends to GE in 2015 and 2016 ($4.3 billion and $20.1 billion,

respectively). We expect GE Capital to release additional dividends of up to approximately $10 billion through the remainder of the plan. In January 2017, GE received an additional $2.0 billion of common dividends from GE Capital. As of December 31, 2016, we are ahead of our plan, having signed agreements with buyers for $197 billion of ending net investment (ENI), excluding liquidity (as originally reported at December 31, 2014), of which $190 billion has closed. As of December 31, 2016, we have substantially completed the dispositions related to the GE Capital Exit Plan. In addition, as part of our initiative to reduce the size of our financial services businesses, we completed the split-off of our remaining interest in GE Capital's North American Retail Finance business, Synchrony Financial, to holders of GE common stock, which resulted in a $20.4 billion buyback of GE common stock (671.4 million shares) in 2015. In connection with the GE Capital Exit Plan, we completed a legal reorganization of GE Capital that included a merger of GE Capital into GE, a guarantee by GE of GE Capital debt, and an exchange of $36 billion of GE Capital debt for new notes guaranteed by GE. The result of all these actions reduced GE Capital's total assets by 63% from $500 billion at December 31, 2014 to $183 billion at December 31, 2016. From inception of plan through December 31, 2016, we incurred charges of $22.0 billion. Due to anticipated tax benefits and gains, we do not expect total after-tax charges through the completion of the GE Capital Exit Plan to exceed our initial $23 billion estimate.

78.     The 2016 10-K contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained in the 2016 10-K was accurate and disclosed any material changes to GE's internal control over financial reporting.

79.     On May 5, 2017, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended March 31, 2017 (the "1Q17 10-Q").  For the quarter, GE reported net income of $653 million, or $0.07 per diluted share, on revenue of $27.49 billion, compared to net income of $228 million, or $0.01 per diluted share, on revenue of $27.83 billion for the same period in the prior year.

80.     In the 1Q17 10-Q's MD&A section, GE stated, in relevant part:

Capital revenues decreased by $0.2 billion, or 7%, primarily due to organic revenue declines and lower gains, partially offset by lower impairments.

Capital losses decreased $0.8 billion, or 95%, primarily due to lower treasury operation expenses, lower preferred dividend expenses and lower restructuring expenses associated with the GE Capital Exit Plan.

○ Within Capital, Verticals net earnings increased due to lower impairments ($0.1 billion) and core increases ($0.1 billion), partially offset by lower gains ($0.1 billion).

○ Other Capital losses decreased by $0.8 billion, or 58%, primarily associated with the GE Capital Exit Plan as follows:

- Lower treasury operation expenses of $0.4 billion reflecting lower excess interest expense, including costs associated with the February 2016 hybrid tender and derivative activities that reduce or eliminate interest rate, currency or market risk between financial assets and liabilities.

- Lower preferred dividend expenses of $0.3 billion associated with the January 2016 preferred equity exchange.

- Lower restructuring expenses of $0.1 billion.

81.     The 1Q17 10-Q contained signed certifications pursuant to SOX by Defendants Immelt and Bornstein, stating that the financial information contained in the 1Q17 10-Q was accurate and disclosed any material changes to GE's internal control over financial reporting.

82.     The Class Period filings by GE reporting revenues, net income, and earnings, along with a description of GE and GE Capital's business in the MD&A section, referenced above in ¶¶ 28-81, failed to disclose that: (i) GE was failing to allocate sufficient reserves with respect to premium deficiencies and other risks associated with GE Capital's legacy reinsurance business; (ii) these risks were then accruing billions of dollars in unreported impairment charges for GE; and (iii) consequently, the value of GE was overstated during the Class Period and additional undisclosed impairments were necessary.  The misstatements and omissions in GE's Class Period Annual and Quarterly Reports violated, *inter alia*, Regulation S-K, Item 303, 17 C.F.R., § 229.303(a) and (b), and Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## The Truth Begins to Emerge

83.     On July 21, 2017, during a conference call with investors and analysts to discuss

the 2Q 2017 results, Defendant Bornstein discussed GE Capital's performance, stating in part:

> Looking ahead, during the second half of the year, we expect lower asset sale.
> And as a reminder, we will conduct our annual impairment review with GECAS
> in the third quarter. In the fourth quarter, we will perform our annual cash flow
> test of our run-off insurance business. ***We recently have had adverse claims
> experience in a portion of our long-term care portfolio and we will assess the
> adequacy of our premium returns.*** We will update you in the fourth quarter.
> Lastly, in other continuing operations for the second half of the year, we continue
> to expect incremental tax benefit associated with recovering a portion of the exit
> plan tax cost we incurred.

(Emphasis added.)

84.     Following this news, GE's share price fell $0.78, or 2.92%, to close at $25.91 on

July 21, 2017.

85.     On October 20, 2017, during a conference call with investors and analysts to

discuss the 3Q 2017 results, Defendant Bornstein further discussed deficiencies with GE

Capital's insurance reserves, stating in relevant part:

> As I mentioned on our last earnings call, ***we've recently observed elevated claims
> experience for a portion of the long-term care book at GE Capital's legacy
> insurance business*** which represents $12 billion or roughly 50% of our insurance
> reserve. As a result, ***we began a comprehensive review in the third quarter of
> premium deficiency assumptions*** that are used in the annual claim reserve
> adequacy test. This is a very complex exercise and the team is making good
> progress. We expect to complete this process by the end of the year. Until the
> review is being completed we've deferred the decision to pay approximately $3
> billion of additional GE Capital of dividend. Year-to-date GE Capital has paid $4
> billion of dividends to GE.

86.     Following Bornstein's comments, GE's share price fell as much as $1.48, or

6.28%, to a low of $22.10 during intraday trading on October 20, 2017.  However, comments by

Defendant Flannery muted the effect of this partial revelation, as the CEO assured investors that

he was concluding an "exhaustive" review of GE's business and that there were "no sacred

cows" at GE.   On Flannery's comments, GE's share price rose $0.25, or 1.06%, to close at $23.83 on October 20, 2017.

87.     On January 16, 2018, GE issued a press release entitled "GE Provides Update on Insurance Review; $6.2B after-tax GAAP charge in 4Q'17," confirming a multi-billion dollar loss in GE's legacy reinsurance business.   The press release stated in relevant part:

- $9.5B pre-tax, $6.2B after-tax GAAP charge in 4Q'17; $7.5B after-tax impact at 21% tax rate (post U.S. tax reform)

- ~$3 billion statutory contribution in 1Q'18 and ~$2 billion annually from 2019 to 2024 for an estimated statutory contribution of ~$15 billion over 7 years

- GE Capital to fund contributions and suspend dividend to GE for foreseeable future

- Ongoing actions over the next two years to make GE Capital smaller, more focused and restore its capital ratios to appropriate levels

- Goodwill and other non-cash impairments of $1.8 billion after-tax related to GE Capital actions

- No impact to Industrial business and 2018 capital allocation plan

BOSTON – January 16, 2018 – GE (NYSE: GE) announced today that the comprehensive review and reserve testing for GE Capital's run-off insurance portfolio, North American Life & Health (NALH), will result in an *after-tax GAAP charge of $6.2 billion for the fourth quarter of 2017, and GE Capital expects to make statutory reserve contributions of ~$15 billion over seven years*.  The Kansas Insurance Department, NALH's primary regulator, approved a phased contribution of ~$3 billion in 1Q'18 and ~$2 billion annually from 2019 through 2024.

"As we disclosed during the company's second- and third-quarter earnings calls and further discussed during our November 13, 2017, investor presentation, earlier this year GE Capital initiated a comprehensive review of our insurance reserves with the assistance of leading outside experts," said John Flannery, chairman and CEO of GE. "This was a rigorous process involving complex factors and estimates relating primarily to long-term care policies written by primary insurance companies and reinsured by NALH."

Flannery added, "The required contributions to the statutory reserve will be made by GE Capital, which has sufficient liquidity to do so. We have been taking

ongoing actions to make GE Capital smaller and more focused while maintaining its key capabilities to support financing for GE Industrial products. These actions will also help restore GE Capital ratios to appropriate levels.  At a time when we are moving forward as a company, a charge of this magnitude from a legacy insurance portfolio in run-off for more than a decade is deeply disappointing."

The required statutory contributions will be a higher number than the GAAP charge, due primarily to modifications of certain assumptions to reflect various potential adverse conditions, as is required for statutory accounting purposes.

(Emphasis added.)

88.     That same day, on a conference call with investors and analysts, Defendant Flannery  stated, in part, that "[c]learly, in hindsight, we underappreciated the risk in [GE's insurance business] book" and that GE was "looking aggressively at the best structure or structures for our portfolio to maximize the potential of our businesses," which "could result in many, many different permutations, including separately traded assets really in any one of our units, if that's what made sense."

89.     On this news, GE's share price fell $1.43, or 7.62%, over the following two trading sessions, to close at $17.33 on January 17, 2018.

90.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of GE's securities, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

91.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired GE securities during the Class Period (the "Class"), and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of GE, at all relevant times, members of their immediate

families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

92.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, GE Securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by GE or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

93.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

94.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

95.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of GE;

- whether the Individual Defendants caused GE to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of GE Securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

96.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

97.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- GE Securities are traded in an efficient market;

- GE's Securities were liquid and traded with moderate to heavy volume during the Class Period;

- GE traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of GE's Securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold GE Securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

98.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

99.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

### COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

100.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

101.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

102.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of GE Securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise

acquire GE securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

103.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for GE securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about GE's finances and business prospects.

104.    By virtue of their positions at GE, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

105.    Specifically, the materially false and misleading statements and material omissions alleged herein violated, *inter alia*, Regulation S-K, Item 303, 17 C.F.R. § 303(a) and (b), which require, in part, that management's discussion and analysis of financial condition and results of operations in annual and quarterly reports "provide such information that the registrant

believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations."

106.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of GE, the Individual Defendants had knowledge of the details of GE's internal affairs.

107.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of GE.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to GE's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of GE securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning GE's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired GE Securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

108.     During the Class Period, GE Securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired GE

Securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of GE Securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of GE Securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

109.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

110.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of GE's Securities during the Class Period, upon the disclosure that GE had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

111.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

112.    During the Class Period, the Individual Defendants participated in the operation and management of GE, and conducted and participated, directly and indirectly, in the conduct of GE's business affairs.  Because of their senior positions, they knew the adverse non-public information about GE's misstatement of income and expenses and false financial statements.

113.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to GE's financial condition and results of operations, and to correct promptly any public statements issued by GE which had become materially false or misleading.

114.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which GE disseminated in the marketplace during the Class Period concerning GE's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause GE to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of GE within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of GE securities.

115.    Each of the Individual Defendants, therefore, acted as a controlling person of GE. By reason of their senior management positions and/or being directors of GE, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, GE to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of GE and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

116.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by GE.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated:  January 18, 2018

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Matthew L. Tuccillo*
Matthew L. Tuccillo (Bar No. ct28411)
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email: mltuccillo@pomlaw.com
        jalieberman@pomlaw.com
        ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ**
**& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
(212) 697-6484
peretz@bgandg.com

*Attorneys for Plaintiff*

Submission Date
2018-01-17 11:46:03

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1.    I  make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against against General Electric Company, ("General Electric" or the "Company") and, authorize the filing of a comparable complaint on my behalf.

3.   I did not purchase or acquire General Electric securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired General Electric securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in General Electric securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.    I declare under penalty of perjury that the foregoing is true and correct.


## Name

Print Name

Luis Salazar


## Acquisitions

Configurable list (if none enter none)

| Date Acquired | Number of Shares Acquired | Price per Share Acquired |
| --- | --- | --- |
| 1/11/18 | 80 | 19.00 |


## Sales


## Documents & Message

Upload your brokerage statements showing your individual purchase and sale orders.



Signature



Full Name

Luis Salazar



**GENERAL ELECTRIC (2018) (GE)**                                                    **Salazar, Luis**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES/UNITS | PRICE PER SHARES/UNITS |
| --- | --- | --- | --- |
| 1/11/2018 | Purchase | 80 | $19.0000 |